IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


DAVID BALLASSO,

      Plaintiff,

vs.                                **Case No.  5:07cv239-SPM/WCS**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

_____/


## REPORT AND RECOMMENDATION

      This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).  It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

      Plaintiff, David Ballasso, applied for supplemental security income (SSI) benefits on February 6, 2004.  He must show disability on or after that date.  Plaintiff was 45 years old at the time of the administrative hearing, has a high school equivalency education, R. 372, and has no past relevant work.  Plaintiff originally alleged disability

due to back and leg pain, gallbladder problems, colitis, and depression, although the only impairments in question before this court are the impairments resulting from leg and back pain.

The Administrative Law Judge found at step two that Plaintiff has a "severe" impairment of degenerative disc disease of the lumbar and cervical spine.  R. 17.  He also found, however, that Plaintiff has the residual functional capacity to do a limited range of light work.[1]  R. 18.  He found that Plaintiff could do such work if allowed to stand or walk for six hours each work day and sit for the entire day, alternating between the two positions, and is further limited to carrying out simple instructions and tasks only.  *Id.*  He found that while Plaintiff has worked off and on over the years, he has no past relevant work as that phrase is defined, and has not engaged in substantial gainful activity since December 31, 1993.  R. 17, 20.  He concluded that Plaintiff has not been disabled as defined by Social Security law since February 6, 2004, the date Plaintiff filed his application for SSI benefits.

---

[1] The Commissioner's rules define "light work" in part:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b) and 416.967(b).

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing**

The hearing was held on June 26, 2006.  R. 368.  Plaintiff testified that when he sits in a chair, his leg goes to sleep and his back becomes stiff and hurts.  R. 373, 377.  He said that his legs "ache and they hurt like they're on fire in the kneecaps all the time."  R. 374.  He thought that he could sit for a couple of hours before he would need to lie down and rest.  R. 385.

Plaintiff said that sometimes in the morning he "just can't stand."  R. 374.  Plaintiff later said that he could stand and walk for 30 minutes to an hour before having to take a break.  R. 377.  He thought he could walk one-half mile.  R. 386.  At another point, Plaintiff said he could stand 45 minutes to an hour before he had to sit down.  R. 384.  At another point, Plaintiff said he could stand about two hours.  R. 385.  He thought that he could sit and stand, alternatively, for about three or four hours.  R. 386.

Plaintiff said he sometimes becomes suddenly faint, dizzy, and has to lie down for 5 or 10 minutes.  R. 374.  He said that "all of [a] sudden – I'm fine and then, all of [a] sudden, I'm not fine."  R. 374-375.

Plaintiff testified that he sleeps 2 to 14 hours each day.  R. 374.  He said that he sometimes has had to stay in bed three or four days, or as long as a week.  R. 381.  Plaintiff said that the pain begins in his lower back and radiates down his legs, down the left leg more than the right sometimes.  Id.  He said that on a good day, the pain is

about 3 to 4 on a scale of 10, and on a bad day, "anywhere from 8 to 10." R. 382. On days when he cannot get out of bed, the pain is at the 10 level. *Id.*

Plaintiff said that he had tried all kinds of muscle relaxers, and said that a muscle relaxer was "the one thing will relieve the pain." R. 382. "[T]he pain would go away, but I couldn't walk. . . . It would just make me numb." R. 383. Plaintiff said that Dr. Stringer told him that they could not operate on his back because he "was afraid I might be paralyzed." R. 379.

Plaintiff testified that sometimes he took meals at a neighbor's home and was given "gas money" for providing "security" for her. R. 376, 387. He drives a motor vehicle "some." *Id.* Plaintiff said that there was not a lot to take care of around his home. R. 384. He cut the grass once a month or so, using a little riding mower for about an hour, but that hurt his back. *Id.* He sometimes visited a neighbor, and sometimes fished for 30 minutes. R. 386.

The vocational expert testified that he had reviewed Plaintiff's "vocational background," and said that the prior work that Plaintiff had done (house repairer, automobile body repairer, pizza baker, pizza delivery, garage mechanic, painter's helper, construction) ranged from light to medium work. R. 388. He testified that a person who suffers mild to moderate pain, "for the most part" is "able to perform tasks required to keep competitive employment." R. 389. Any pain level above that "starts to eliminate, erode and then eliminate the jobs over a, a sustained basis." *Id.*

The Administrative Law Judge then asked the vocational expert to consider a hypothetical individual who is a younger person, with a GED education and a prior work history similar to Plaintiff's work history, and with all of the symptoms and limitations

described by Plaintiff above in his testimony.  R. 390.  The vocational expert said that

such a person could not do any sort of job.  *Id.*

As an alternative, the vocational expert was asked to consider a hypothetical

person with the same vocational factors (a younger person, GED education, with a prior

work history similar to Plaintiff's work history) able to do light work of a simple and

routine nature, without exposure to hazards, with the option of occasionally shifting

positions and with a sit or stand option.  R. 390.  The expert said that such an individual

could do the job of deliverer of merchandise as Plaintiff performed it.  *Id.*  He or she also

could do unskilled light work as an office helper, ticket seller, and mail clerk.  R. 391.

**Medical Evidence**[2]

Plaintiff was seen by Kamel Elzawahry, M.D., on September 30, 1996.  R. 147-

149.  He complained of neck pain, a burning sensation and numbness of the arms, a

shooting pain in his left foot, back pain and left leg pain, and soreness in the neck and

back.  R. 149.  He said he worked as a handyman.  *Id.*  The complaints arose out of a

motor vehicle accident a month earlier.  *Id.*  He also reported that he had been injured in

two prior accidents.  *Id.*  Upon examination, Dr. Elzawahry found that Plaintiff had

"tenderness over the region of the lower part of the back but SLR [straight leg raising

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:  http://www.mercksource.com (Medical Dictionary link), or other sources.

test[3]] and forward bending are negative."  R. 148.  "Tandem walking, gait, station and

base were all examined and were normal.  Romberg's sign[[4]] was negative."  *Id.*  Dr.

Elzawahry reviewed the x-ray of Plaintiff's cervical spine and "it appears to be normal."

*Id.*  Dr. Elzawahry said that Plaintiff "is having radicular symptoms for a period of 4

weeks and appears to be in a great deal of pain."  R. 147.  He prescribed pain

medications and advised Plaintiff to have an MRI of both the cervical and lumbar spine,

and to return to his office when the studies were completed.  *Id.*

Plaintiff returned on October 9, 1996.  R. 147.  Plaintiff complained of increasing

neck pain radiating to his shoulder and arm, with numbness, tingling, and burning, and

back pain radiating to both gluteal regions and the lower extremities.  *Id.*  Dr. Elzawahry

said that Plaintiff had cervical and lumbar disc disease with evidence of degenerative

changes by x-ray of the lumbar spine, and osteophyte disc complex at C5-6 on the MRI

of the cervical spine, and a bulging annulus of the disc at L5-S1 with no clear evidence

of herniation.  *Id.*  He prescribed pain medications, heat, hot showers, continuation of

---

[3] Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips forward and onto a bone below it.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.  A sign of this condition is that a straight leg raise may be uncomfortable or painful.  *Id.*

[4] Swaying of the body or falling when standing with the feet close together and the eyes closed; the result of loss of joint position sense.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

Dr. Greene's treatment program, and exercises to build up the abdominal and back muscles. *Id.* NCV[5] and EMG[6] studies were ordered. *Id.*

Plaintiff had the NCV and EMG studies on October 30, 1996. The NCV test produced normal results for the upper and lower extremities. R. 146. The EMG of the lower extremities (lumbar back region) was normal. R. 143. The EMG study of the upper (cervical) extremity was abnormal, however, with "findings consistent with posterior primary rami spinal root irritation at the lower paracervical region." R. 142.

Plaintiff returned for treatment by Dr. Elzawahry on November 7, 1996, with the same painful symptoms. R. 141. He was advised to "continue with conservative measures." *Id.* On return on January 15, 1997, with the same painful symptoms, Dr. Elzawahry detected a "few trigger points" and provided trigger point injections on February 3, 1997. R. 140-141.

On return to Dr. Elzawahry on April 10, 1997, Plaintiff was still having "suprascapular pain," but his neck and "intrascapular" pain had resolved to a large extent. R. 140. Dr. Elzawahry's assessment was that this was a post-traumatic condition with evidence of osteophyte disc complex at C5-C6 and L5-S1, consistent with primary rami spinal root irritation in the lower paracervical region. *Id.* He ordered a repeat of the trigger point injections and maintained Plaintiff on the same conservative measures. *Id.* The injections occurred on April 16, 1997. R. 139.

---

[5] Nerve conduction velocity testing. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[6] Electromyography, that is, an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

The next medical record is over four years later.  On September 7, 2001, Plaintiff was examined by Merle P. Stringer, M.D., for a neurological evaluation.  R. 138. Plaintiff gave "the history dating back to about three months ago when he sustained a twisting type injury to his lower back while in Nashville, Tennessee."  *Id.*  He went to the emergency room, was treated "conservatively," and his symptoms improved.  *Id.*  He said that he "did well" until about a month earlier, when he had a recurrence of lower back pain while he was "helping a friend frame a house."  *Id.*  Plaintiff complained of pain in the neck, left upper extremity, lower back, and left leg.  *Id.*  Examination of the neck revealed no paracervical muscle spasm, moderate limitation of flexion and extension of the neck secondary to pain localized in the lower back without radiculopathy.  *Id.*  Spurling's test[7] was negative.  *Id.*  Examination of the back revealed no evidence of paravertebral spasm, but with some moderate limitation of flexion and extension of the back, secondary to pain, again localized in the lower back, but nonradicular.  R. 137.  The impression was radiating neck pain, low back and left leg pain, rule out nerve root compression for both regions.  *Id.*  An MRI scan was scheduled for the cervical and lumbar spine.  *Id.*

The MRI was conducted on November 19, 2001.  The cervical spine was essentially normal except that at C5-C6 there was "a mild broad-based disc bulge,

---

[7] This test is used for evaluation of cervical spine radiculopathy.  The patient laterally bends the neck to each side while maintaining a posture of cervical extension.  Pain intensified with ipsilateral bending strongly suggests a diagnosis of radiculopathy.  Pain with contralateral bending suggests musculo-ligamentous origin.  UNIVERSITY OF FLORIDA, COLLEGE OF MEDICINE, available at: http://www.med.ufl.edu/rheum/rheumTests.htm

which does not result in significant central canal or neural formaminal stenosis.[8]  The

remaining disc spaces are well-maintained."  R. 131.  The impression was "[m]inimal

degenerative change at C5-6, with no significant canal or neural foraminal stenosis."  *Id.*

The MRI of the lumbar spine revealed:

> Mild disc dessication is noted at L3-4, L4-5, and L5-S1.  At the L4-5 level,
> there is mild broad-based circumferential disc bulge, which results in
> minimal narrowing of both neural foramina.  There is no significant central
> canal stenosis.  No frank disc herniations are appreciated.

R. 132.  The upper lumbar intervetebral disc spaces were "well-maintained."  *Id.*  The

lumbar vertebral bodies were found "to maintain normal height, alignment and signal

intensity."  *Id.*

On November 27, 2001, Plaintiff returned to Dr. Stringer complaining of

continued neck and lower back pain.  R. 136.  The back pain was worse and

aggravated by activity.  *Id.*  A complaint of some muscle spasm in the cervical and

lumbar spine was noted.  *Id.*  Examination of Plaintiff's neck revealed tenderness to

palpation, mild cervical paraspinous muscle spasm and mild myofascitis.  *Id.*  The neck

was limited in movement to 60-70% of normal, and Spurling's test was positive, causing

neck and trapezius pain with no radicular component.  *Id.*  On further examination, Dr.

Stringer found:

> There is tenderness to palpation of the mid and lower lumbar area of a
> mild to moderate degree with myofascitis of the lumbar spine and lumbar
> paraspinous muscle spasm of a mild to moderate degree.  Limitation of
> forward bending to 60% of normal.  Limitation on extension and lateral
> bending to 50% of normal.  There is increased pain with extension
> indicating facet area pain.  Straight leg raising causes low back pain and

---

[8] Stenosis is an abnormal narrowing of a duct or canal.  DORLAND'S ILLUSTRATED
MEDICAL DICTIONARY.

SI joint pain with no radicular component.  Motor examination shows normal upper extremity strength is normal [sic], deltoids, biceps, triceps, wrist flexors or wrist extenders, and grip all within normal limits.  Lower extremity strength is normal, with hip flexors, hip extenders, quadriceps, hamstrings, dorsiflexion and plant flexion all within normal limits. . . .

R. 135.  Dr. Stringer's impression was cervical disc disease and neck pain, and lumbar disc disease and low back pain, both with no evidence of nerve root compression.  *Id.* He noted that the MRI showed degenerative changes at C5-C6, and mild bulging at disc L4-L5.  *Id.*  Dr. Stringer said that he did not recommend surgery, but did recommend trigger point injections.  *Id.*  Lortab[9] and Flexeril[10] were prescribed for "severe" pain.  *Id.*

Plaintiff was seen by Dr. Elzawahry on August 16, 2002, complaining of back and leg pain, with leg numbness.  R. 133.  Plaintiff reported at that time that he was "a subcontractor for remodeling houses and repairs."  *Id.*  Dr. Stringer's finding that he had degenerative disc disease without evidence of nerve root compression was noted.  *Id.* He was taking "simple pain medications."  *Id.*  On examination it was found that Plaintiff had normal tone, power, coordination and reflexes in his upper and lower extremities. R. 134.  Plaintiff had tenderness over the lower back region, with positive forward bending and positive straight leg raising.  *Id.*  The impression was low back pain with radicular symptoms.  *Id.*

---

[9] Lortab is one of the brand names for hydrocodone.  PHYSICIANS' DESK REFERENCE (2004), p. 3233.  Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[10] Flexeril is prescribed as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions.  PHYSICIANS' DESK REFERENCE (2004), p. 1985.

On June 17, 2003, Plaintiff was examined on a consultative basis by Osama Elshazly, M.D.  R. 188.  Plaintiff said he was involved in a truck accident on a Navy base in 1983 resulting in back and low extremities pain.  *Id.*  Plaintiff related a trip to the hospital in Tennessee.  *Id.*  He said that the pain interfered with his ability to hold a job.  *Id.*  He was not taking medications because he could not afford them.  *Id.*  Plaintiff said he was unemployed and had been unemployed for two years, but that he used to work in a lawn service.  R. 189.  On examination Dr. Elshazly found that Plaintiff had tenderness over his lumbosacral spine with mild to moderate spasm, but without radicular symptoms.  *Id.*  Straight leg raising was negative to 90 degrees and sitting bilaterally.  *Id.*  Standing balance and gait were normal.  R. 190.  Plaintiff had full range of extension, lateral flexion, and rotation of his cervical and lumbar spine.  R. 191.  Dr. Elshazly did not have any MRI or CT scans, but he had the impression that Plaintiff had chronic pain involving cervical and lumbar disc disease.  R. 190.  He also noted a history of hypertension, hyperlipidemia, and depression.  *Id.*

Plaintiff was seen on a consultative basis by James E. Hord, Ph.D., for a mental status evaluation on June 19, 2003.  R. 193.  Plaintiff reported that he "has always worked as a finishing carpenter."  *Id.*  He reported that he had not worked for the last two years.  *Id.*  He was then taking Flexeril and Celebrex.[11]  *Id.*  Plaintiff said that in his daily activities he "was always 'on the go.' "  It was reported to Dr. Hord that:  "He cuts

---

[11] Celebrex is prescribed for acute pain, menstrual cramps, and the pain and inflammation of osteoarthritis, ankylosing spondylitis (rheumatoid arthritis of the spine), and rheumatoid arthritis.  It is a member of a new class of nonsteroidal anti-inflammatory drugs (NSAIDs) called COX-2 inhibitors.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

yards, does carpentry work and also lies around." *Id.* Dr. Hord found Plaintiff to be

hyperactive in general presentation. *Id.* He was "constantly shaking, moving his legs,

arms and was involved in some activity during the time that he was here and I would

consider the bulk of this to be involuntary." R. 194. Dr. Hord said: "In mood and affect

he describes himself as depressive but I do not think that the manic component can be

ignored." *Id.* Dr. Hord's diagnosis on Axis I was bipolar disorder (rule out), and major

depression, recurrent, moderate. *Id.* He assigned a GAF score of 75 on Axis V.[12] *Id.*

On May 4, 2004, Plaintiff was examined on a consultative basis by Kris

Lewandowski, M.D. R. 254. Plaintiff said he had experienced pain since the 1980's,

but it was now worse. *Id.* He said the pain is "daily, located in the lower back, radiating

to the right leg and knee on the left side, down to the calf and foot." *Id.* Muscles in his

leg twitched, his right leg would grow numb, and it would become hot. *Id.* He said that

for the prior 6 to 7 years his left upper extremity would become numb every few weeks.

*Id.* Plaintiff's medications were Flexeril and NSAIDs (nonsteroidal anti-inflammatory

drugs). *Id.* Upon examination, he found that Plaintiff's back was not tender to palpation

and no muscle spasm was observed. R. 255. Dr. Lewandowski found that Plaintiff's

upper and lower extremities were equal bilaterally, without joint swelling, mobility was

not impaired, and muscle bulk and strength were intact. *Id.* He said: "Physical

---

[12] *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp. A GAF score of 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." *Id.* "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.' *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)." Sims v. Barnhart, 309 F.3d 424, 427 n.5 (7th Cir. 2002).

examination does not reveal significant abnormalities."  *Id*.  Dr. Lewandowski found

calluses on both of Plaintiff's hands, "indicating [a] significant amount of manual labor."

*Id*.

On June 25, 2004, Plaintiff underwent a consultative mental status evaluation by

Clell C. Warriner, Ph.D.  R. 258.  Plaintiff said that he had worked as a "skilled auto

technician, a body and fender man, a paint[er], a roofer, an electric helper, as a

landscaper, and has done carpentry work."  *Id*.  "Most recently he worked as an

independent home improvement man doing various kinds of remodeling and

construction."  *Id*.  Plaintiff said that his primary problems were pain in his lower back,

numbness and tingling in his legs and feet, and a knee problem.  *Id*.  He said he spends

time during the day " 'piddling around the house' and doing a variety of self-care and

simple maintenance chores."  *Id*.  Plaintiff's mind was found to be "sharp and quick."  *Id*.

At the time of the examination, Plaintiff had no physician and was not taking any

medications.  R. 259.  Dr. Warriner's assessment was personality disorder NOS (not

otherwise specified) with manic features, and chronic pain disorder (mild).  *Id*.  He

assigned a GAF score of 75.  *Id*.

**Legal Analysis**

### Whether the ALJ posed a complete question to the vocational expert

Plaintiff asserts that while the Administrative Law Judge concluded that he could

do light work with a sit or stand option, avoidance of hazards, and work that only

involved carrying out simply instructions and task, the only limitation he provided to the

vocational expert was that the hypothetical individual experienced mild to moderate

pain.  Doc. 14, p. 14.  Plaintiff argues that had the ALJ included in the hypothetical that

the person was able to "understand, remember and carry out only simple instructions," as well as the restrictions that the person avoid hazards, do only light work, and be allowed to sit or stand, the work base would have been greatly eroded.[13]  *Id.*

This contention is not supported by the record.  Some of the hypothetical that resulted in denial of benefits is not in this record because the audiotape was inaudible in two places, but there is enough to show that the ALJ gave a hypothetical of an individual who could only do light exertional tasks of a simple and routine nature, avoiding hazards, and with a sit or stand option.  R. 390.  The ALJ did not, in this hypothetical, assume that the person suffered "mild to moderate pain," but the vocational expert had already said that:

> pain at the mild to moderate level, for the most part, allows or – people are able to perform tasks required to keep competitive employment.  Anything above the moderate level at marked, severe, frequent, generally becomes fairly problematic.

R. 389.  The first claim is without merit.

---

[13] "In order for a VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002).

**Whether the ALJ erred in finding Plaintiff's subjective complaints of pain to be only partially credible due to two positive straight leg raising tests and due to improper consideration of Plaintiff's daily activities**[14]

Plaintiff argues that the ALJ's rejection of his pain testimony in part was not based upon substantial evidence in the record because the ALJ determined that all straight leg raising tests had been negative for pain, when in fact two SLRs were positive for pain.  Doc. 14, p. 16.  Plaintiff argues that the record shows that he had a medically determined condition, degenerative disc disease of the lumbar and cervical spine, and it is common for this condition to cause pain.  *Id.*, p. 15.  He also argues that it was not proper for the ALJ to discount his testimony based upon evidence of his daily activities.  *Id.*, p. 17.

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law,

---

[14] These grounds are raised as issues two and three in Plaintiff's memorandum, but are considered together because both relate to the ALJ's determination of the credibility of Plaintiff's pain testimony.

that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d
1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for

disregarding the claimant's subjective pain testimony must be based upon substantial

evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain

standard if his findings "leave no doubt as to the appropriate result" under the law.

Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

The ALJ determined that Plaintiff's testimony was not fully credible for a number

of reasons.  There were four straight leg raising tests in the record.  Two were positive

for pain and two were negative.  The ALJ erred when he found that none of the tests

were positive for pain.  R. 18.  The finding was not cited for evidence to reject Plaintiff's

testimony.  Rather, it was in the analysis at step 3, to determine whether Plaintiff's

"severe" impairment met or equaled a Listed impairment.

But even if this minor error had been cited as a basis for discounting Plaintiff's

pain testimony, the ALJ relied upon a significant amount of other record evidence to

support that conclusion.  He found that written documents submitted by Plaintiff showed

that he engaged in greater activity than described in his testimony.  The ALJ found that

these documents represented that Plaintiff "cooks, does household cleaning, shops,

drives, does household repairs, does yard work and works on cars.  He also indicated

that he has done some household repairs for others, including family members and a

friend in another State."  R. 18.  These findings are supported by substantial evidence in

the record.  R. 94.

The ALJ said that the record was "peppered" with inconsistencies about Plaintiff's work activities, and found that the "inconsistencies tend to reflect poorly on the claimant's overall credibility."  R. 18-19.  This finding is also supported by substantial evidence in the record, though the inconsistencies arise mostly when compared to Plaintiff's testimony.  The medical records indicate that Plaintiff reported that he did work as a handyman (1996), helped a friend frame a house in Tennessee (2001), was a subcontractor for remodeling homes (2002), but despite this, was unemployed for two years, but that he used to work in a lawn service (2003), "always worked as a finishing carpenter" and "cuts yards, does carpentry work and also lies around" (2003), and on May 4, 2004, Dr. Lewandowski noted that Plaintiff's hands were callused, "indicating [a] significant amount of manual labor."  R. 149, 138, 133, 189, 193, 255.  On June 25, 2004, Plaintiff said that he had worked as a "skilled auto technician, a body and fender man, a paint[er], a roofer, an electric helper, as a landscaper, and has done carpentry work" and "[m]ost recently [ ] worked as an independent home improvement man doing various kinds of remodeling and construction."  R. 258.  Even if some of this reported work activity was in the remote past, there is enough in the medical records to conclude that Plaintiff was quite active in his work from 1996 through 2004, when the records end.

Further, the ALJ reasoned:

Mr. Ballasso is independent in all activities of daily living.  He has had very little and very sporadic medical treatment with none from the alleged onset date until February 1994.  He has had long periods of time with no treatment at all (none in 1998 and 1999 and none between November 2001 and December 2002.)  He has had no substantiated treatment since June 2005, more than a year now.  His treatment has not consistently been for any one complaint such as back pain, which he alleges is severe

enough to disable him completely.  His treatment has been for a variety of
injuries, usually incurred while working on cars or around the house, his or
others.  He has not had any psychologically based treatment.  He is able
to engage in a variety of physical and social activities including driving to
Tennessee and installing cabinets for a friend.  His subjective complaints
are out of proportion to and not supported by the objective medical
evidence.  The undersigned has considered and given limited weight to
the claimant's poor work history. . . .

R. 20.

All of these findings are supported by substantial evidence in the record

discussed at length above.  The ALJ discounted Plaintiff's testimony of involvement in

limited daily activities as the medical record indicated much more significant activities as

discussed above.  Despite these daily activities, however, Plaintiff's record of earned

income has been very sporadic since 1979, when he became 18 years of age.  R. 76.

This was substantial evidence in the record to rely upon in the consideration of Plaintiff's

credibility.  Further, the medical records show a mild to moderate degenerative cervical

and lumbar spinal condition, but without herniation.  The treatment record for back pain

is sporadic and conservative, and strong pain medication has not been often prescribed.

The ALJ accounted for the mild degenerative disc disease findings with a determination

that Plaintiff could do light work with a sit or stand option.  In summary, the ALJ correctly

applied this circuit's pain standard, and his findings are supported by substantial

evidence in the record.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge

correctly followed the law and are based upon substantial evidence in the record.  The

decision of the Commissioner should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on April 25, 2008.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**



**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**